## THE STATE v. WILLIAM C. DINES, Appellant.

### Division Two, November 19, 1907.

1. **FALSE PRETENSE.** To authorize a conviction for a violation of the statute concerning the obtaining of money or property by false pretenses (sec. 1927, R. S. 1899), every essential element of the offense must be established.

2. —————: **Purchasing Land: Ownership.** In order to establish the alleged false pretense that defendant was the owner of land he conveyed to his grantee, there must have been a false representation that he was the owner of the land, and that the grantee relying upon that representation purchased and paid for it.

3. —————: —————: —————: **Deed.** A quitclaim deed made by defendant to a grantee does not of itself furnish any evidence of false representations made by defendant to the grantee, of his ownership of the land, or of the grantee's reliance on them. And a deed which contains only a special warranty against the claims of the grantor and of any person claiming under him, is, in effect, such a deed.

4. —————: —————: —————: **Failure of Evidence.** Where the record reveals no representation made by the defendant, at the time the deed was made, that he was the owner of the land, a verdict, finding that he falsely represented that he was the owner, cannot stand.

5. —————: —————: **Assumption of Ownership.** An assumption by both defendant and his grantee, while negotiations for the sale of the land were being conducted, that defendant was the owner, does not establish the charge that defendant falsely and fraudulently represented and pretended that he was the owner.

6. ———: ———: Ownership: Negotiations: Deed.  Where defendant and his purchaser assumed that defendant was the owner of lands described in the deed, which in fact had been granted but never located, and after negotiations protracted through several years defendant conveyed the lands to the purchaser at his price, who paid defendant that price, the deed, in which defendant warranted the land free from any claim by himself or any person claiming under him, negatives the idea that he was required to resort to false representations as to his ownership of the land in order to effect the sale, and also disproves any reliance on the part of the grantee upon any statement made by defendant as to his ownership or as to the existence of the lands.

7. ———: ———: ———: Inference.  Positive proof that the victim relied up the false representations is not required, but that reliance may be inferred from the facts and circumstances in evidence. But the inference must be a legitimate one. It cannot rest on a mere conjecture that defendant made false representations.

8. ———: Existence of Lands: Location.  The indictment charged that defendant falsely represented that lands described in his deed as grants 46 to 60 of the Cooper grant in Montgomery county, Georgia, were real and actual tracts of land really and actually in existence. The State introduced a grant of land by the State of Georgia in Montgomery county, called the Cooper grant; and the proof further showed that tracts 46 to 60 of the Cooper grant were never located, nor correctly described and the description placed of record. *Held*, that it may be true that the lands embraced within the Cooper grant were never located or a description placed of record, and that no title ever passed to any one by reason of the Cooper grant, but it does not follow that the lands were not in existence, and proof that defendant did not own the lands, and that the records did not show they had ever been located, did not establish the charge that defendant had falsely represented that they existed.

9. ———: ———: No Proof.  The evidence in this case is reviewed and it is *held* to fail to show that defendant, by false representations as to the existence of lands described in his deed, induced the purchaser to part with his money.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel G. Taylor,* Judge.

REVERSED.

*Chester H. Krum, Joseph Block, Tyson S. Dines* and *C. B. Crawley* for appellant.

The State's evidence did not warrant submission of the case to the jury, and the instruction to that effect asked by defendant should have been given. Before a transaction can be successfully impeached on account of alleged false and fraudulent representations, the well-established doctrine, even in civil actions, is that five elements must concur: 1. The party charged must have made some representation of a material fact; 2. Such representation must have been false; 3. It must have been made for the purpose of inducing the other party to engage in the particular transaction in question; 4. The other party must have been ignorant of the truth; 5. The other party must have believed such representation and acted upon it. Live Stock Remedy Co. v. White, 90 Mo. App. 498; Halliwell Cement Co. v. Stewart, 103 Mo. App. 182; Langdon v. Green, 49 Mo. 363; Dunn v. White, 63 Mo. 181; Anderson v. McPike, 86 Mo. 293; Nauman v. Oberle, 90 Mo. 666; Lewis v. Land Co., 124 Mo. 672; Warren v. Ritchie, 128 Mo. 311; Tinker v. Kier, 195 Mo. 183; State v. Evers, 49 Mo. 542; State v. Kingsley, 108 Mo. 141; State v. Keyes, 196 Mo. 162; State v. Cameron, 117 Mo. 641.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State.

(1) It is not required that formal, express verbal representations be made to bring the case within the statute, but any false representation of a past or existing fact, intended to deceive, relied upon by the victim and that causes him to part with his money or property, is sufficient, whether such pretense was in words, signs or conduct. 2 Bishop's New Crim. Law, sec. 430; State v. Goble, 60 Iowa 447. The false pretense of having title to property, whether real or personal, made by one

offering it for sale, is within the statute. 2 Bishop's New Crim. Law, sec. 444; State v. Newell, 1 Mo. 248; State v. Roberts, 21 Mo. 702; State v. Keyes, 196 Mo. 136; State v. Bradley, 68 Mo. 140; State v. Munday, 78 N. C. 460; Com. v. Lee, 149 Mass. 179. (2) The facts and circumstances, considered together with Alt's conduct, leave no doubt that Alt implicitly relied upon the representations made by defendant as to this land, and, as defendant himself admitted under oath, supposed he was getting a perfect title. While Alt was dead at the time of the trial and the State could not, therefore, prove by him that he relied upon the pretenses alleged to have been made, it was not necessary, under the law, that such testimony should have been given by the victim in order to authorize a conviction. 5 Ency. Ev., p. 751; People v. Hong Quin Moon, 92 Cal. 42. (3) Appellant contends that it was shown by the State that the State of Georgia had made the grant of lands called the Cooper grant, and that, therefore, the lands must be in existence. It is but a mere truism to say that if the State granted lands, the lands must have existed, and the same could be said of a deed. But from the fact that the grant by the State appears of record, it does not necessarily follow that the lands described existed, or that if they did, title passed by such grant. Sovereignty has varied powers, but it cannot by a grant create land and water, as seems to be the import of defendant's argument. (4) The point is made that the law is declared to be that if the alleged victim had in his own hand the means of ascertaining the truth before engaging in the transaction, then the prosecution failed, and nothing remained for the jury to determine. The case of State v. Keyes, 196 Mo. 136, is cited in support of this statement of the law, but an examination of that case will disclose the fact that it announces exactly the opposite doctrine.

State v. Dines.

FOX, P. J.—This cause is now pending in this court upon appeal by the defendant from a judgment of the circuit court of the city of St. Louis, convicting him of obtaining property under false pretenses. Omitting formal parts, the indictment upon which this prosecution and judgment is predicated, is as follows:

"The grand jurors of the State of Missouri, within and for the body of the city of St. Louis, now here in court, duly impaneled, sworn and charged, upon their oaths present that: William C. Dines, then and there pretending a desire to sell the lands hereinafter described, on or about the twentieth day of October, one thousand nine hundred and three, at the city of St. Louis aforesaid, with the felonious intent then and there to cheat and defraud one Henry Alt, Jr., did feloniously, wilfully, fraudulently, knowingly, designedly and falsely pretend and represent to the said Henry Alt, Jr., that he, the said William C. Dines, was then and there the owner in fee simple of certain tracts and parcels of land situate in the county of Montgomery, and State of Georgia, more particularly described as follows, to-wit: Grants numbers 46 to 60, both inclusive, being grants of 1,000 acres each, containing 15,000 acres, being a part of the Thomas Cooper survey of 77,000 acres, and lying within the 1221st and 51st Districts, G. M., and being the same property conveyed to the said W. C. Dines, trustee, by deed dated June 25, 1895, recorded in the recorder's office of Montgomery county, Georgia, July 3, 1895, in Book S. S., pages 374 and 375, together with all and singular the hereditaments and appurtenances thereto belonging, or in anywise appertaining and the reversion and reversions, remainder, rents, issues and profits thereof, situate in the county of Montgomery and State of Georgia, and that the said tracts and parcels of land, so above described, were then and there real and actual tracts and parcels of land, really and actually in being

and existence in said county of Montgomery and State of Georgia aforesaid, and that he, the said William C. Dines, was then and there individually and as trustee, owner of the said tracts and parcels of land above described, and that he, the said William C. Dines, as widower and trustee, did then and there have full power, right and title to convey said tracts and parcels of land above described in fee simple, and that a certain deed of conveyance to said Henry Alt, Jr., of date October 20, 1903, executed by the said William C. Dines on said day, as an individual widower, and as trustee, and describing said tracts and parcels of land hereinbefore described as situate in the said county of Montgomery and State of Georgia, was then and there a deed of conveyance of real and actual tracts and parcels of land, then and there really and actually in being and existence in said county and State, and that the said Henry Alt, Jr., believing the said false pretenses and representations, so made to him by the said William C. Dines, as aforesaid, to be true, and relying upon and confiding in the same and being deceived thereby was induced by reason thereof, to buy said purported lands from said William C. Dines, and as part of the consideration therefor to pay and deliver, and did in fact, then and there pay and deliver to the said William C. Dines certain personal properties of the said Henry Alt, Jr., of great value, to-wit, of the value of fifteen thousand dollars, lawful money of the United States, and consisting of a certain check drawn by said Henry Alt, Jr., at the city of St. Louis, Missouri, on October 20, 1903, on the American Exchange Bank of said city, payable to the order of said William C. Dines, trustee, in and for the sum of one thousand dollars, which said check was then and there of the value of one thousand dollars, lawful money of the United States, and of a certain cashier's check, issued by the American Exchange Bank of the said city of St. Louis,

Missouri, to William C. Dines, trustee, on the same day, in the sum of fourteen thousand dollars, which said check was then and there of the value of fourteen thousand dollars, lawful money of the United States, both of which said checks were then and there the property of Henry Alt, Jr., and it is further averred that said William C. Dines, by means of said false pretenses and representations so made to the said Henry Alt, Jr., as aforesaid, then and there unlawfully, knowingly, feloniously, fraudulently and designedly, did obtain of and from the said Henry Alt, Jr., the said personal properties aforesaid, consisting of a certain check drawn by Henry Alt, Jr., at the city of St. Louis, Missouri, on October 20, 1903, on the American Exchange Bank in said city of St. Louis, payable to the order of the said William C. Dines, trustee, in the sum of one thousand dollars, which said check was then and there of the value of one thousand dollars, lawful money of the United States, and of a certain check issued by the said American Exchange Bank of said city of St. Louis, to William C. Dines, trustee, on the same day in the sum of fourteen thousand dollars, which said check was then and there of the value of fourteen thousand dollars, lawful money of the United States, both of which said checks were then and there the property of the said Henry Alt, Jr., and both of which were together then and there of the aggregate value of fifteen thousand dollars, with felonious intent then and there to cheat and defraud the said Henry Alt, Jr.;

"Whereas, in truth and in fact, he, the said William C. Dines, was not then and there the owner in fee simple of certain tracts and parcels of land, situate in the county of Montgomery and State of Georgia, more particularly described as follows, to-wit: Grants numbers 46 to 60, both inclusive, being fifteen grants of 1,000 acres each, containing fifteen thousand acres being a part or portion of the Thomas Cooper Survey

of 77,000 acres, and lying within the 1221st and 51st Districts G. M., and being the same property conveyed to the said W. C. Dines, trustee, by deed dated June 25, 1895, recorded in the recorder's office of Montgomery county, Georgia, July 3, 1895, in Book S. S., pages 374 and 375, together with all and singular the hereditaments and appurtenances thereto belonging, or in anywise appertaining and the reversion and reversions, remainder, rents, issues and profits thereof, situate in the county of Montgomery and State of Georgia, and whereas, in truth and in fact, the said tracts and parcels of land so above described were not then and there real and actual tracts and parcels of land, really and actually in being and existence in the said county of Montgomery and State of Georgia aforesaid;

"And whereas in truth and in fact the said William C. Dines was not then and there, individually and as trustee, owner of the said tracts and parcels of land above described;

"And whereas in truth and in fact the said William C. Dines, as widower and trustee, did not then and there have full power, right and title to convey said tracts and parcels of land, above described, in fee simple;

"And whereas in truth and in fact, the certain deed of conveyance to Henry Alt, Jr., grantee, named therein, of date October 20, 1903, executed by the said William C. Dines, on said day as an individual widower and as trustee, and describing said tracts and parcels of land, hereinabove described as situate in the said county of Montgomery and State of Georgia, was not then and there a deed of conveyance of real and actual tracts and parcels of land, then and there really and actually in being and existence in said county and State, all of which the said William C. Dines then and there well knew; against the peace and dignity of the State."

This indictment was returned by the grand jury

against the defendant William C. Dines at the June term, 1905, of the circuit court of the city of St. Louis. The cause was assigned to Division No. 9 of said court for trial, but upon the application of the defendant for a change of venue from the judge of said division, the cause was transferred to Division No. 11 of said court. At the December term thereof, 1905, the defendant entered his plea of not guilty and the trial of the cause proceeded.

The record in this cause is rather voluminous and we shall not undertake to give in detail all of the facts developed at the trial, but shall be content with a statement of the controlling facts, which will be sufficient to enable us to determine the legal propositions involved in this proceeding. The defendant, William C. Dines, had resided in the city of St. Louis for about twenty years at the date of the offense charged in the indictment. Prior to that date he had been associated with Henry Alt, Jr., and others in a sewing machine company. This business did not prove successful and was abandoned about six or eight years before the trial of this cause. The defendant and Alt were also associated together in a mining business. Henry Alt, Jr., resided in the city of St. Louis, was a box manufacturer and had been engaged in that business in said city for about twenty years at the time of the transaction upon which this prosecution is based. In winding up the business of the sewing machine company Henry Alt took a deed from Mr. Bolland and others interested in the sewing machine company for five thousand acres of timber land, supposed to be located in Montgomery county, State of Georgia, which was described as part of the "Thomas Cooper" grant. Some six or eight years before a sale was consummated and deed executed to Henry Alt, Jr., by the defendant to certain grants of land in Georgia, the defendant began negotiations

with Mr. Alt for the sale of certain lands that he claimed in the State of Georgia. One of the witnesses, Mr. Sehrt, testified that he had lived in St. Louis some twenty-five years, being engaged in the manufacture of boxes under the name of the Alt Box Manufacturing Company; he knew Henry Alt, Jr., during his life time and was engaged in business with him in the manufacture of boxes. He testified as to the business relations between Mr. Alt and the defendant. He then testified in answer to questions as to the first conversation he heard between the defendant and Henry Alt, Jr., in reference to land in Montgomery county, in the State of Georgia. He stated that he was present when one conversation took place and that the first conversation occurred some six or eight years from the time at which he was giving his testimony, and that from time to time other conversations of like nature took place. This witness testified substantially that at the time he was present with the defendant and Alt the defendant had a little slip and showed to Mr. Alt what land he had there, that is, the land he claimed he had there. The witness stated that he claimed he had about thirty-five thousand acres, "I think it was," and it was worth from five to eight dollars per acre; that was printed on the slip. This witness further stated that in this conversation Mr. Alt just merely listened at it and didn't try to buy at all. There were several other conversations between defendant and Alt but when the appellant offered the land to Alt, Alt would never buy, but always wanted to get it cheaper. The price talked of for the land was $3.50 an acre. The witness referred to a conversation between Alt and the defendant about a year before the deed was executed. He said that Dines offered the land at three dollars an acre. At these meetings of Alt and defendant the witness stated that they would get out their plats and look it over

and talk about it in a natural way as men would. "They talked about the timber land—timber on it— and soil of the land, and that it was situated on the Pendleton river and there was a thousand acres in the section, and they'd run over the numbers of the sections." About six months before Mr. Alt died, or six months before the transaction was made, this witness stated that the appellant said there was a man down in Georgia who was like August Gehner here and examined titles like said Gehner, that is the remark he made, and shortly before the trade was made he brought the man to Mr. Alt's place of business and introduced him as Mr. Loud. The evidence tended to show that Mr. Loud was acting with the defendant and was the defendant's representative to whom he referred prospective purchasers in Montgomery county, State of Georgia. The witness further stated that the last time, when they made the deed, they were in the office and talked about the land in a general way. "Then Mr. Dines went out to step into the buggy and Mr. Alt stepped out too, and turned around to me and said, 'I'll buy that land for two dollars an acre,' and that was the last heard of it then. The defendant wanted $2.50." This witness while on the stand was shown a plat which he said Mr. Alt produced and the witness also stated that on the first occasion when he saw this plat Alt had it. This witness also identified a letter dated June 29, 1903, addressed to Henry Alt, Jr., as bearing the signature of the appellant, and he said that the slip which was read in evidence accompanied the letter. The witness stated that the plat to which his attention was directed, was produced by Alt at the interview between Alt and the appellant. The plat identified by this witness was read in evidence by the State. The State then offered in evidence the letter identified by this witness, dated June 29, 1903, addressed to Henry Alt, Jr., which was as follows:

State v. Dines.

"Henry Alt, Jr., Esq.,

"St. Louis, Mo.

"Dear Sir:—I send you a little plat showing the numbers of the 15,000 acres of yellow pine timber in the Thomas Cooper grant, which adjoins the 5,000 acres you own. The printed slip attached was gotten up by others owning land adjoining ours, which is no better, if as good. My suggestion is much better for you than a purchase; that is for you to advance me $1.25 per acre or $18,750 at six per cent per annum for three years. This is $1,125 per year, payable each six months $562.50. Deducting the $3,300 which you have advanced would leave $15,450 to be paid over to me at present, for which I will give you a note for $18,750 payable in three years with interest from maturity and six notes of $562 payable each six months from date, with an agreement that if you wish to buy the land at any time during this period at the price of $3 per acre, you could do so by surrendering the notes to me and paying the balance due.

"I should be glad to hear from you in a few days.                    Yours very truly,

"W. C. Dines,

"Room 602 Roe Bldg."

This letter was accompanied by a printed slip attached to it, which read as follows:

"A large tract of fine 'Long Leaf Yellow Pine Land,' located in Montgomery county, Georgia. This land is free from rocks or swamp lands, soil is of a sandy loam and will raise all crops that are raised in the State. No better peach land in the United States; the finest watermelon land in the world, and the timber will cut 12,000 to 18,000 feet per acre. The turpentine privilege is worth $2.50 to $3 per acre. The land is located about fifteen miles northeast of Mt. Vernon, the county seat, near the Pendleton creek. Perfect title. Price $2 per acre."

In connection with the testimony of Mr. Sehrt the State introduced a plat, which is marked in the record as "Exhibit A," which contained the survey of 77,000 acres, comprising the Thomas Cooper grant. This plat was certified as a true copy of the survey on record in Montgomery county, Georgia. Following this testimony the State introduced in evidence the deed from Dines to Mr. Alt, which is as follows:

"State of Missouri, City of St. Louis:

"This indenture, made this 20th day of October, A. D. 1903, by and between William C. Dines (widower) and W. C. Dines, trustee, of the city of St. Louis and State of Missouri, party of the first part, and Henry Alt, Jr., of the city of St. Louis and State of Missouri, party of the second part, Witnesseth:—

"That the party of the first part, in consideration of the sum of one thousand dollars to him paid by the said party of the second part, the receipt of which is hereby acknowledged, does, by these presents, remise, release, alien and convey unto the said party of the second part, and to his heirs and assigns forever, all the following described lots, pieces or parcels of land lying, being and situated in the county of Montgomery and State of Georgia, to-wit:

"Grants numbers forty-six to sixty, both inclusive, being fifteen grants of one thousand acres each, containing fifteen thousand acres, and lying within the 1221st and 51st districts, G. M., and being the same property conveyed to the grantor herein, W. C. Dines, trustee, by deed dated June 25, 1895, recorded in the recorder's office of Montgomery county, Georgia, July 3, 1895, in Book SS, pages 374 and 375; together with all and singular the hereditaments and appurtenances thereunto belonging or in any wise appertaining, and the reversion and reversions, remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim or demand whatsoever of the said party,

of the first part, either in law or in equity, of, in and to the above-described premises with the hereditaments and appurtenances:

"To Have and To Hold the above described premises, and each and every part thereof, with the appurtenances, unto the said party of the second part, and his heirs and assigns forever, so that neither the said party of the first part, nor his heirs, nor any other person or persons for him, or in his name or behalf, shall or will hereafter claim or demand any right or title to the aforesaid premises, or any part thereof, but they, and every one of them, shall by these presents be excluded and forever barred.

"And the said William C. Dines and W. C. Dines, trustee, party of the first part, for himself, his heirs, executors, administrators and successors, does covenant, promise and agree, to and with the said party of the second part, his heirs and assigns, that he, the said William C. Dines, either in his individual capacity or as trustee, has not done, nor suffered to be done, anything whereby the said premises hereby granted are or may be in any manner incumbered or charged, and that the said premises, against all persons lawfully claimed, or to claim the same, by, through or under him, either in his individual capacity or as trustee as aforesaid, he, the said William C. Dines, will warrant and forever defend, subject only to all taxes and assessments levied after the year nineteen hundred and three.

"And the said party of the first part hereby expressly waives and releases any and all right, benefit, privilege, advantage and exemption under and by virtue of any and all statutes of the State of Georgia, provided for the exemption of homesteads for sale or execution or otherwise.

"In Witness Whereof, the said party of the first part has, in his individual capacity and as trustee as

aforesaid, hereunto set his hand and seal, the day and year first above written.

"WILLIAM C. DINES,          (Seal).

"W. C. DINES, Trustee,      (Seal).

"Signed, sealed and delivered in presence of us.

"JAS. W. GRANT,

"HAROLD JOHNSON,

"Commissioner of Deeds for the State of Georgia, within the State of Missouri."

"(Seal.)."

The following endorsement appears on the back of said deed:

"Filed for record in the Clerk's office, Montgomery County, Ga., Oct. 23, 1903, and duly recorded in Deed Record No. 4, page 56 and 57, October the 23rd, 1903.

"D. B. GRAHAM,

"Clerk Superior Court, M. Co., Ga."

George P. Miller was introduced by the State as a witness. He testified to having executed a deed to the defendant for the amount of land contained in the deed to Mr. Alt. This witness testified that he did not own any land in Montgomery county, Georgia, and that the only consideration he received for acknowledging that deed was five dollars. A copy of the deed executed by Miller was offered in evidence. We deem it unnecessary to reproduce that deed in this statement. The tax-collector of Montgomery county, Georgia, was introduced as a witness and he substantially stated that he was unable to find any record of the land as described in the deed to Alt in his county. Mr. Smith, a witness for the State, testified that he made a trip to Montgomery county, Georgia, and examined all the records and he substantially stated that, while he found in the Secretary of State's office a room full of grants bound up in books, thousands and thousands of them, he found no land of the particular

description on the records of Montgomery county, Georgia, as that contained in the deed to Mr. Alt. This witness further testified that in the month of September, 1905, he heard the appellant testify that he received a letter from George E. Wood of Chicago, with respect to the Georgia lands, in August, 1901. This letter was as follows:

"W. C. Dines,
        "No. 4633 Margaretta Ave.,
                "St. Louis, Mo.
    "Dear Sir:—I am sending you by express the following papers:
        "Abstract of title to Cooper grant.
        "Abstract of title to Scott grant.
        "Blue print of the Cooper lands.
        "Fifteen patents of tracts 46 to 60 (inclusive).
        "Cooper grant 2 deeds from John H. Douglass, Trustee, to yourself, dated April 15, 1901.
        "Affidavit of W. C. Dines.
        "Affidavit of Geo. P. Miller.
        "Affidavit of Wm. B. Homer and Gaius Paddock.
        "Deed from Gaius Paddock and Wm. B. Homer to W. C. Dines.
        "Deed from International Land Co. to W. C. Dines.
        "Deed from Geo. H. Dunford to W. C. Dines.
    "This embraces all of the papers placed in my possession with the exception of a plat to the Cooper lands, and possibly a plat of the Scott lands, which Mr. Anderson, who has not yet returned, has with him. Immediately upon his return (which will be within a few days), I will forward the above-mentioned plats to you.
    "I have acted in this matter in the best of good faith, as evidenced by the fact that I have spent a large sum of money in attempting to prove the title to these properties, and no one could regret more than I do the necessity of letting the matter drop. No record of the

Scott grant can be found in the Secretary of State's office at Atlanta or in the records of Montgomery county. You will find among the papers a circular letter from the Secretary of State of Georgia, which will show you how the State officials regard these titles. The lands in the so-called Cooper grant were in reality never surveyed, and the act of the Legislature in 1795 making these grants void has been sustained by the State court and the United States court. The parties now in possession of these lands have head-right grants, and this with continuous possession for one hundred years gives them a title which in the opinion of reliable attorneys in Georgia cannot be overcome.

"Yours truly,

"GEORGE E. WOOD."

This witness further testified that he had heard the defendant testify in some other case in which he stated that Alt at the time he accepted the deed thought he was getting a good title.

Another witness testified on the part of the State, Mr. Posey. He substantially stated that he had met the defendant in the winter of 1900. "He turned in a description of a piece of property for us to sell." This land was embraced in certain grants known as the "Cooper grants;" that he went to Georgia and met Mr. Loud, to make an investigation as to the land and was unable to locate it.

Another witness for the State was Mr. John H. Douglass. He produced a deed dated August 1, 1898, executed by W. C. Dines, trustee, and Annie M. Dines, conveying grants number 46 to 60 inclusive, each containing one thousand acres in the Thomas Cooper grant. This witness stated that he was present at a conversation between his father and the appellant in which it was stated how his father came into possession of the deed, what it was for and what he gave for it. In this conversation the father of the witness stated: "If any-

thing happens to me, when Mr. Dines pays up his debt, these lands are to be transferred to him, as I merely hold them as collateral, although on the face of the deed it appears that I am the absolute owner." The witness stated that a man named Black was sent by his father to Georgia with reference to these lands, and subsequently at Iola, Wisconsin, the witness told the appellant that Captain Black had reported his inability to locate any such land in Montgomery county, and that he considered the lands worthless, and to support his opinion he had gone to Atlanta and there endeavored to get the records of the Secretary of State, but had been refused these records, and at that time was given a circular letter that the Secretary of State had gotten out concerning land frauds in Montgomery county, Georgia. In July, 1901, the witness had a conversation with the appellant in the office of the appellant. The witness told him that they had used the very best efforts that any one could possibly use to locate these lands. "I told him that at Iola, and that they had not been productive, that in the estimation of the specialists that we sent down there they did not exist. Of course, that was what we based our opinion on." In 1901 the father of the witness reconveyed the property to the appellant. The witness stated that he had tax receipts in his possession for taxes paid upon properties in Montgomery county, and a tax receipt was read in evidence in connection with the testimony of this witness, as follows: "Taxable property returned, $15,000. Office of Tax Collector, Montgomery County, Ga. Received of John H. Douglass, 15 tracts, 46 to 60, inclusive, Thomas Cooper grant, $150 state and county taxes, including wild lands, for the year 1899, this 27th day of December, 1899. D. S. Williamson, T. C. M. C." Check by which these taxes were paid was read in evidence: "Bremen Bank, No. 22158. St. Louis, Mo., December 16, 1899. Pay to the order of John H. Doug-

lass three hundred and thirty dollars. $330. To Messrs. Kountze Brothers, New York." Endorsed: "Pay to D. S. Williamson, Esq., Tax Collector, Montgomery County, Ga., or order. John H. Douglass." Endorsed: "Pay to the order of the Southern Bank of Savannah, Ga., D. S. Williamson, Tax Collector, Montgomery County, Ga."

The State read in evidence the following document: "Georgia, Montgomery Co. This is to certify that Lots 6 to 18, inclusive, 23 to 35, inclusive, Robert Scott grant, and lots 45 to 60, inclusive, Thomas Cooper grant, is reported for taxation for the year 1898 by W. C. Dines, trustee, at $1 per acre. D. S. Williamson, Tax Collector, C." Endorsed on back of said paper: "Georgia, Montgomery Co. I certify that D. S. Williamson is Tax Collector of Montgomery Co., Ga. G. L. Adams, C. S. C."

The State offered in evidence a certain copy of records authenticated by the clerk of the Superior Court of Montgomery county, by the Governor and by the Secretary of State of Georgia under the seal of the State, the paper being an abstract of title to 77,000 acres of land in Montgomery county, Georgia, beginning with the grant "State of Georgia to Thomas Cooper," grant dated the 3d day of January, 1795, and registered in office of Secretary of State in Book M. M. M. M. conveys seventy-seven grants of one thousand acres each. The abstract, which is set out in full in the record, shows the transmission of title by mesne conveyances to the appellant, and by him by deed dated October 20, 1903, to Henry Alt, Jr.

H. M. Dalton, on the part of the State, testified that he visited Henry Alt about a month or so before his death. There were with him the appellant, Mrs. Alt and a Mr. Wheelock and Colonel Loud. There was a discussion in Alt's bedroom regarding payment of some taxes claimed to be due on Montgomery county

land, and the witness judged from the conversation that there had been a sale of that land from the appellant to Alt, and the appellant should have paid the taxes, or claimed that it had been paid at the time of the sale. Alt contended that they had found out that they had not been paid at the time of the sale, the taxes amounted to something near $1,500. Alt contended that they had not been paid and that they must be paid; that appellant contended that they had been paid, or rather that there were none due. An agreement was drawn—Loud dictating most of it—and the appellant affixed to it a note for $1,440 made by Alt which was to be forfeited if taxes were shown to be due. Thereupon the agreement referred to was read in evidence, as follows:

"State of Missouri, City of St. Louis:

"December 7, 1903.

"This agreement made and entered into this 7th day of December, 1903, between W. C. Dines, party of the first part, and Henry Alt, Jr., party of the second part, both of the city of St. Louis, State of Missouri,

"Witness: That, whereas there is a question of payment of certain taxes, both State and county, upon the following described lands in the county of Montgomery, State of Georgia, to-wit: Grants 46 to 60, both inclusive, in what is known as the Thomas Cooper survey for taxes, the said W. C. Dines as grantor is responsible and liable. Therefore, in order to secure the payment and the settlement of all taxes to the sum of $1,440, the same being all taxes, both State and county, the said Dines has this day deposited with the St. Louis Union Trust Company a note for the sum of $1,500, executed on the 20th day of October, 1903, due and payable two years after date, said note to be held by the St. Louis Union Trust Company in escrow,

to be delivered and canceled by the St. Louis Union Trust Company upon the payment by the said Henry Alt, of the taxes against said lands, and any remainder or balance not covered by said payment to be paid to the said W. C. Dines. And in the event that it should be found that the said taxes have been paid, and that there is no liability upon the said above-described lands, then the said note to be returned to the said W. C. Dines. Said note to be held for thirty days and the question of payment to be approved by the St. Louis Union Trust Company upon the receipt of the certificate of the tax receiver of Montgomery county for both state and county.

"W. C. Dines,
"Henry Alt, Jr."

Another witness was introduced on the part of the State, Mr. Brand. He testified that he was the administrator of Henry Alt's estate. He stated that he made an inventory of the estate and that he inventories as the first item "five tracts of land in Montgomery county, in the State of Georgia, each for 1,000 acres, more or less, being tracts numbers 63, 64, 65, 67, lying on the waters of the Pendleton creek, and being part of the Cooper grant in said county, the same having been acquired from Patrick J. Finley by deed dated January 3, 1895, recorded in the office of the Secretary of State in Book of Grants 'M. M. M. M.' Folio 550." This witness further stated that from information in his possession he was able to say that Mr. Alt paid taxes on this property; that he found stubs or checks showing such payments.

At the close of the State's evidence counsel for appellant requested the court to give an instruction in the nature of a demurrer to the testimony, in which the jury were instructed, upon the evidence adduced by the State, to return a verdict of not guilty. This instruction was refused.

On the part of the appellant, A. B. Corwin testified that some time prior to October, 1903, he had a conversation with Henry Alt, in regard to these Georgia lands, and particularly a conversation with him in relation to the effort to sell the land to Wood, in which Alt stated that the deal had fallen through, remarking that it was a shame the way they had treated Mr. Dines in the matter. Alt stated in this conversation that the property could be located. Before the purchase from the appellant Alt told the witness that he thought there was a good thing in the lands. He said that the persons connected with the Wood deal had made a bungle of it, made a botch of it in undertaking to locate it, the way they went at it, that is the person who went down for Wood.

J. B. Dines, on the part of the appellant, stated that he was a brother of the appellant; that in December, 1902, he went to Georgia at the instance of the appellant to get an abstract of title, and to find out the condition of the land; that when he was in Montgomery county he went on these lands; that a party living there—a Colonel Loud—told him that he was on the lands. This was northeast from Mount Vernon. The timber on the land was nearly all pine—long leaf pine. The witness and Loud stepped off a couple of acres, counted the trees and they took measurements of a large one and a small one, the idea of the witness being to verify the amount of lumber that would be on an acre; that he got an abstract of the land—which was furnished him by the clerk of the court—abstract of title.

Louis A. Battaile, cashier of the Mechanics-American-National Bank, testified that in the month of October, 1903, Henry Alt, Jr., came to him, asking him to fill up check for $14,000, and to get him a cashier's check payable to the order of Mr. Dines; that he wanted the witness to deliver that cashier's check to the appellant under certain conditions. The directions in

fact were that "when we received a dispatch from the recorder of some county in Georgia—I think it was Montgomery county—that the taxes had been paid, or that there were no taxes due on a certain tract of land there, to deliver that cashier's check to Mr. Dines. We received such a dispatch in a few days afterwards, probably two or three, and on the day that we received it, or the day after, Mr. Dines came in and got the cashier's check, and, according to my recollection, endorsed on that memorandum the receipt of it. Mr. Alt then came in and I showed him the dispatch and the receipt, and he said it was all right. I don't know that he said anything, but that ended it."

George E. W. Luehrmann, for the appellant, testified that he was in the lumber business, having been engaged in that business for eighteen years; that he knew Henry Alt, Jr., he was a neighbor of his in business; that he knew him almost daily. Alt told him that he had bought some land from the appellant. Before the purchase was made Alt told the witness that a price of $75,000 had been made to him on this land. Alt thereupon said "the deal was too much, and asked whether I would go in with him to buy the property. I told him I would, but would have to examine the property first." Alt told the witness to go ahead and make arrangements to get his man to go on the property. A little later on his man took sick and died. The next thing Alt informed him that he had bought the property. He bought it for $30,000 and didn't need the witness in the deal.

A deed dated April 15, 1901, from John H. Douglass to W. C. Dines, trustee, was read in evidence by the appellant, which is a deed of special warranty conveying back to the appellant property which appellant had conveyed previously to Douglass.

John F. Bolland, for the appellant, testified that he was in the jewelry business with the Bolland Jewelry

Company, having been engaged in that business for
about thirty years; that he knew Henry Alt, Jr., being
associated with him in the sewing machine business in
which there were also associated Mr. Able and the ap-
pellant.   In the winding up of the business of the sew-
ing machine company the witness acquired some land
in Georgia, some five thousand acres, in which he dis-
posed of his interest to Henry Alt, Jr.   The witness was
aware of the negotiations between the appellant and
Henry Alt in regard to the larger tract of land in
Georgia.   About a year before he finally bought it, Alt
told the witness that he wanted to buy it—wanted to
get it—that the appellant wanted a certain price for it
and he wouldn't pay that, but in case he could get it at
a certain price he would buy it.   The witness told him
to be careful; that if he put up that much money he
should have the title examined.   He said he had and
that he was satisfied.   The witness asked him to let him
get even on his stock and sell him some of it, and he
said he wouldn't part with it. After the transaction was
consummated, the witness had a talk with Mr. Alt.
He felt very jubilant about it and happy.   He came in
the store and told the witness that he had got that tract
of land at last.   He says, "I have been trying to get
it for some time and I got it at my price."   To the best
of witness's recollection, Alt stated that the appellant
wanted a certain price and he wasn't willing to pay it,
and afterwards Alt came in and told the witness that
he had bought it at his price.   The witness was asked
whether in any of these conversations with Alt before
the transaction with the appellant was consummated
he made any comparison of these lands which he was
expecting to get from Dines with the lands he already
owned, or made any statement in regard to it by way of
comparison, and Alt told the witness it was the same
tract of land; he said it was adjoining the five thousand
acres that he then owned, and had bought from the

sewing machine company. This was all the evidence adduced on the part of the appellant.

At the close of all the evidence counsel for the defendant renewed their request for an instruction in the nature of a demurrer to the testimony, which was denied. The court then submitted the case to the jury upon instructions which embraced the views of the court as to the law applicable. to the testimony. We deem it unnecessary to here reproduce the instructions given. Should it be essential to the determination of this case they will be given such consideration as we deem necessary in the course of the opinion. The cause having been submitted to the jury they returned a verdict finding the defendant guilty as charged in the indictment and assessed his punishment at imprisonment in the penitentiary for five years. Timely motions for new trial and in arrest of judgment were filed and by the court taken up and overruled. Sentence and judgment were entered of record in conformity to the verdict and from this judgment the defendant prosecutes this appeal, and the record is now before us for review.

## OPINION.

The record before us discloses that the trial court submitted this cause to the jury upon three of the alleged false pretenses:

FIRST. That the appellant, in his own name and as trustee, was the owner of the lands.

SECOND. That the tracts were real and actual tracts of land really and actually in being and existence in Montgomery county, Georgia.

THIRD. That the deed purporting to convey said tracts was a conveyance of real and actual tracts of land actually in being and existence in said county and State.

Numerous errors are assigned by the appellant as

206 Sup—43

grounds for the reversal of the judgment rendered in this cause; however, it is apparent from a careful analysis of the entire record that the main and overshadowing proposition involved in this proceeding is whether or not there was sufficient evidence to authorize the submission of the cause to the jury.

At the very threshold of the consideration of this cause we deem it not out of place to say that the conduct of the appellant in this transaction is by no means to be commended, and if the record in this case speaks truly, and it is to be presumed that it does, it clearly demonstrates, viewing it from a moral standpoint, that the appellant's conduct in this transaction was reprehensible beyond expression. With this record before us we can readily understand how a jury could reach the conclusion that the appellant should be confined in the State penitentiary, without undertaking to justify that conclusion by an application of the legal principles applicable to the offense charged in the indictment. While the transaction from which this prosecution emanates merits the condemnation of all right-thinking people still we take it that the appellate courts would not be justified in doing violence to well-settled rules and principles of criminal law, applicable to the offense charged, in order to meet out merited punishment for a class of swindling that does not fall within the purview of the statute defining the offense charged.

We have substantially indicated the facts as developed at the trial of this cause, and the question presented is, did the facts, as herein indicated, authorize the submission of the cause to the jury? This is the legal proposition confronting us, and the rules of law applicable to such state of facts should not be relaxed in order to reverse the judgment, nor should they be extended in order to find justification for the affirmance of it.

The section of the statute upon which this indict-

ment is predicated, section 1927, Revised Statutes 1899, provides: "Every person who, with intent to cheat or defraud another, shall designedly, by color of any false token or writing, or by any other false pretense, obtain the signature of any person to any written instrument, or obtain from any person any money, personal property, right in action or other valuable thing or effects whatsoever, and every person who shall, with the intent to cheat and defraud another, agree or contract with such other person or his agent, clerk or servant for the purchase of any goods, wares, or merchandise or other property whatsoever, to be paid for upon delivery, and shall, in pursuance of such intent to cheat and defraud, after obtaining possession of any such property, sell, transfer, secrete or dispose of the same before paying or satisfying the owner or his agent, clerk or servant therefor, shall, upon conviction thereof, be punished in the same manner and to the same extent as for feloniously stealing the money, property or thing so obtained."

We have carefully read and analyzed in detail all of the testimony developed upon the trial of this cause and see no escape from the conclusion that the testimony was insufficient to authorize the submission of the cause to the jury. While the acts and conduct of the appellant in this deal may be reprehensible, that alone is insufficient to authorize his conviction of the crime charged. The offense charged is defined by the statute, as heretofore indicated, and in order to authorize a conviction of that crime every essential element of the offense must be established. As was said by GANTT, J., in State v. Cameron, 117 Mo. loc. cit. 648, "It is not the policy of the law to punish as a crime the making of every foolish or ill-considered agreement. If it is, the jails and prisons must be greatly enlarged."

Upon the first pretense submitted to the jury, that appellant, in his own name and as trustee, was the

owner of the land, an examination of the record discloses that there was no sufficient evidence to authorize the submission of that question to the jury. That appellant claimed to own the land there can be no dispute, for clearly there would have been no transaction whatever unless he had gone to Alt to sell him the land that he claimed to own. Witness Mr. Sehrt stated: "He, meaning appellant, had a little slip and that showed that land that he had there; he claimed he had there. He claimed he had about thirty-five thousand acres, I think it was, and it was worth from five to eight dollars per acre. That was printed on the slip." This statement of the witness was relative to a conversation that occurred six or eight years before the deed was executed. Mr. Smith, the attorney representing Mr. Alt, testified that the defendant had testified in some other case that Alt thought he was getting a good title when he bought. It would not be necessary for any witness to make that statement, for it was evident that he would not buy the land and pay out a large sum of money for it unless he thought he was getting a good title. The letter identified by the witness of June 29, 1903, had reference to efforts on the part of the defendant to securing a loan, for which he would execute his notes for $18,750, payable in three years, with interest from maturity, and six notes for $562 payable each six months from date, with an agreement that if Mr. Alt wished to buy the land at any time during the period for which these notes were executed, at the price of three dollars per acre, he could do so by surrendering the notes of the appellant and paying the balance due. This letter simply stated that he sent him a plat showing the number of fifteen thousand acres of yellow pine timber in the Thomas Cooper grant, which adjoins the five thousand acres Mr. Alt owned. With this letter he attached a printed slip, which he said was gotten up by others owning land adjoining ours, which he says, "is

no better, if as good." The testimony further shows that he made frequent visits after his first conversation but no sale was completed until the 20th of October, 1903, when the deed was executed. In these conversations witness stated that Alt would listen, but never offered to buy, and the testimony indicates that there was a dispute as to the price; finally on the 20th of October, 1903, Alt made the purchase for $2 an acre and accepted the appellant's deed. Whatever offense, if any was committed, was completed at the time of the execution of this deed and the procuring of the checks of Mr. Alt. This record, at the time of the execution of that deed, is absolutely silent as to any representations made by appellant as to ownership, and the deed itself furnishes no evidence as to representations made to Mr. Alt or his reliance in them. In order to constitute this offense upon that pretense, there must have been a false representation that he was the owner of the land, and that Mr. Alt, relying upon that representation, purchased and paid for it in the manner as shown by the testimony in the case. All of this testimony in its last analysis amounts to nothing more nor less than negotiations going on between parties for the sale and purchase of land, with the assumption that the grantor made claim and was the owner of the land. These negotiations finally culminated in the real transaction, the execution and delivery of the deed on the 20th of October, 1903. This deed speaks for itself and absolutely negatives the idea that the appellant was required to resort to false representations as to the ownership of the land in order to effect the sale, and also disproves any reliance upon the part of Mr. Alt in any statement made by the appellant as to his ownership, or that he had a good title to the land. The deed did not purport to in any way warrant the title to the property, but was one which, in effect, was a quitclaim deed with a special warranty as against the claims of the

grantor, or any person claiming under him. The recitations in the deed, which must be treated as the culmination of all the negotiations in respect to such land, mean nothing more nor less than saying to Mr. Alt, "I remise and quitclaim to you all my right, title and interest in the grants described in the deed. I will not warrant or defend the title as to every person, but will limit such warranty to myself and those who claim under me."

In other words, the defendant, speaking through his deed, declined to assume a civil liability by reason of the failure of title, much less subjecting himself to a successful criminal prosecution.

In the case of State v. Chunn, 19 Mo. 233, this court, in treating the statute defining the offense of obtaining money under false pretenses, very clearly stated the law upon this subject. It was there said: "In the case of the King v. Codrington, 1 Carrington & Payne 661 (also in 11 Eng. Com. L. 518), the indictment was for obtaining money by false pretenses. It charged that the defendant obtained the sum of £29 3s. by falsely pretending to a person named Varlow, that he was entitled to a reversionary interest in the one-seventh share of a sum of money left by his grandfather, whose name was Wickes; whereas, in fact, he was not entitled to any interest in any share, etc., negativing the pretenses. Plea, not guilty. It was stated, in opening, that the defendant pretended that he was entitled to the reversionary interest mentioned in the indictment, and thereby induced Varlow, the prosecutor, to purchase it on the 22d of December, 1824, at the price of £29 3s.—the defendant having, in fact, sold all his interest in it to a person named Pick, on the 18th September, 1824. To prove the pretense, a deed dated December 22, 1824, assigning the defendant's interest in his one-seventh share of the money to Varlow, was put in, and *in this deed, there was the usual covenant*

*for title.* The prisoner's counsel objected that this
deed was no evidence of any false pretense, for if it
was every breach of every covenant would be indicta-
ble. LITTLEDALE, Justice, said: 'Certainly a covenant
in a deed cannot be taken to be a false pretense. The
prosecutor was then called, and he proved that defend-
ant asked him to purchase a seventh share of some mon-
ey that he would be entitled to under his grandfather's
will, on the death of one of his relatives, and that he
agreed to purchase it, and got a deed of assignment ex-
ecuted to him, and he thereupon paid the purchase mon-
ey. To prove the falsehood of the pretense, the previ-
ous assignment by the defendant to Pick was put in.
The counsel for the prisoner objected that the prosecu-
tor did not advance the money in consequence of the
verbal pretense used by the defendant, but took the
covenant as his security. What passed between the
parties by parol, was afterwards embodied in the deed;
it was a mere breach of covenant. For the prosecution
it was contended that the indictment charged that the
defendant obtained the money by pretending that he
was entitled to this reversionary interest. That pre-
tense was proved to be a false, and yet it is to be con-
tended that, because he reiterated that pretense in a
deed, it bcomes no offense. In reply, the counsl for the
defendant observed: "It is not everything which is
untruly stated at the time of a bargain, which is an in-
dictable pretense." ' LITTLEDALE, J., said: 'The doc-
trine contended for, on the part of the prosecution,
would make every breach of warranty or false assertion,
at the time of a bargain, a transportable offense. Here
the party bought the property, and took as his security
a covenant that the vendor had a good title. If he now
finds that the vendor has not a good title, he must re-
sort to the covenant. This is only a ground for a civil
action.' See also Rex v. Pywell et al., 1 Stark. 402.

. . .    The pretense with a warranty is not a criminal false pretense."

With this state of the record we are of the opinion that it would be the merest conjecture to say that the defendant made false representations that he was the owner of this land and had the legal title, that Mr. Alt relied upon such representations and by reason of such reliance parted with his property or money. Mr. Alt himself had obtained conveyances to about five thousand acres in this same Cooper grant, part of which was being conveyed to him by the appellant. It is disclosed by the record that he was in possession of plats respecting this grant, and when the entire disclosures of the record are considered, with his acceptance of the character of the deed as introduced in evidence, it simply demonstrates that he was not relying upon statements by the appellant and that even a good business man may make a foolish and ill-considered agreement. In reaching the conclusion as to the false pretenses as to ownership of the land we are not unmindful of the contention of the learned counsel representing the State that positive proof is not at all times required as to the reliances of the victim upon the representations made. That the reliance, which is essential in cases of this character upon the representations made by the party victimized, might be inferred from other facts and circumstances in the case, there is no dispute, but it is equally clear that the inference must be a legitimate one and authorized by the facts and circumstances in proof. In our opinion there is an absolute failure of the proof of any facts and circumstances which would authorize the legitimate inference that Mr. Alt relied in parting with his money upon the representation that the defendant was the owner of the land conveyed by the deed in proof; but the reverse is true, that the deed and other facts and circumstances disclosed by the record indi-

cate that he gave no consideration or attention whatever to the statements made by the defendant.

This brings us to the consideration of the other pretenses submitted to the jury by the instructions of the court as indicated herein by numbers two and three. Those pretenses practically involved the same subject and will be treated together, that is, that the appellant represented that the tracts were real and actual tracts of land really and actually in being and existence in Montgomery county, Georgia, and that the deed purporting to convey said tracts was a conveyance of real and actual tracts of land actually in existence in said county and State.

Upon the propositions respecting these pretenses we have carefully considered the disclosures of the record, and we are unable to find the slightest testimony which authorized the submission of the cause to the jury upon that theory. Upon the trial of this cause the State introduced in evidence the grant of land by the State of Georgia in Montgomery county, called the Cooper grant, and the court in submitting this cause to the jury instructed them that there was no evidence that the grant read in evidence had been invalidated by any court. That the appellant in this cause had no title to the lands embraced in any grant there can be no dispute, but that the grant of land by the State of Georgia as introduced in evidence by the State, embraced land actually in existence, is equally beyond dispute. That the land contemplated by the Cooper grant was never located, nor correctly described and placed of record may be true, and it may also be true that no title ever passed to anybody by reason of such grants, but it by no means follows from such a state of facts that the grant as introduced by the State in evidence did not embrace land in existence. There is an entire absence from this record of any discussion between the appellant and Mr. Alt as to the real existence of the lands contained

in the grant designated in the deed, and the fact that Mr. Alt himself was claiming 5,000 acres in this same grant and had been paying taxes upon it would clearly indicate that he was not giving any attention, not even to the extent of discussing the proposition, as to whether or not the land really existed in these grants.

The fundamental error assumed in the trial of this cause was the making of the failure and inability to locate or find upon the records any definite description of the land contemplated by the grant a basis for the conclusion that there was in fact no land embraced in the grant. As before stated it is clearly shown that the State of Georgia by the Cooper grant embraced lands in Montgomery county, Georgia, and it by no means follows because such lands cannot be located or there is no record of them, that the lands as contemplated by such grant did not in fact exist. The false representations in respect to these pretenses charged in the indictment are substantially that the defendant falsely represented that the lands described in his conveyance as grants from 46 to 60 were then and there real and actual tracts or parcels of land really and actually in existence in the county of Montgomery and State of Georgia aforesaid. The defendant was not charged with a false representation that the lands embraced or contemplated by the Cooper grant had been located and had a definite description upon the record in Montgomery county in the State of Georgia. His deed simply conveyed whatever title or interest he may have had in lands granted by the State of Georgia by the Cooper grant in 1795, and while all records respecting the Cooper grant may have been destroyed, and it may be that the grant was subsequently annulled, and the lands embraced in the Cooper grant may no longer be known in the State of Georgia by the description contained in the appellant's deed to Mr. Alt, yet it by no means follows that the lands as granted by the

State of Georgia in the Cooper grant of January 3, 1795, did not exist.

It will be observed that the court permitted a conviction of defendant, not upon the theory that the grant by the State of Georgia as introduced by the State did not embrace lands existing at the time of the execution of the deed by the appellant, but upon the theory that there was no land in Montgomery county known by the description contained in said grants. This was the view of the trial court as evidenced by the instructions. The court, in declaring the law upon this subject, said: "The court instructs the jury that there is no evidence that the grants read in evidence have been invalidated by any law of the State of Georgia, or declared to be invalid by any court. And if you believe that there was any land in existence at the time Dines made the deed to Alt, Jr., corresponding to the descriptions contained in said grants, you will acquit the defendant." By that instruction it is apparent that the court recognized the validity of the grant by the State of Georgia and said to the jury that the grants read in evidence have not been invalidated by any law of the State of Georgia or declared to be invalid by any court. If this be true, then the grants were valid and embraced actually existing land, notwithstanding the definite boundaries of the land may not have been located. The court by another instruction recognized the validity of the grant, and we are unable to comprehend how the jury under that instruction found a verdict of guilty. It told the jury that "if you believe that the land described in the grants from the State of Georgia was actual and existing at the date when Dines executed the deed to Henry Alt, Jr., however difficult they may be or have been of location, you will acquit defendant." It will be observed from that instruction that the court told the jury that "if the land described in the grants from the State

of Georgia was actual and existing at the date when Dines executed the deed to Henry Alt, Jr., however difficult they may be or have been of location, you will acquit defendant.'' In our opinion it is too plain for discussion that the land described in the grants from the State of Georgia, as introduced in evidence by the State, not only existed at the date of the defendant's deed to Henry Alt, Jr., but has existed ever since the grant was made and will exist as long as time lasts. The annihilation of the grants or the destruction of the records does not annihilate or destroy the land that was embraced in the grants. It is not a question as to whether the grant was valid or whether the grant has at this time any valid existence; the proposition is, is the land which was embraced in the grant, as made, actual and existing land? The description of it may have been changed and the records of the grants entirely obliterated, yet it by no means follows that the land which was embraced in that grant did not in fact actually exist; however, for the purposes of this case, it may be conceded that there is no land known by the description contained in appellant's deed, yet we again repeat, there is an entire absence from the record of any testimony which shows any sort of discussion between the appellant and Mr. Alt as to the actual existence of lands by the description incorporated in the deed. Mr. Alt, as we have heretofore indicated, claimed five thousand acres under a similar description; had been paying taxes upon it, and clearly there were no representations made by the defendant upon that subject, shown by the record, upon which Mr. Alt relied, and which induced him to part with his money or property.

We have thus indicated our views upon the propositions disclosed by the record, and though the acts and conduct of the appellant in this deal with Mr. Alt may have been never so reprehensible, from a moral point of view, yet we are unable to conclude that the facts de-

veloped at the trial establish the essential elements of the offense of obtaining money or property by false pretenses as defined by the statute. Entertaining these views the judgment of the trial court in this case should be reversed, and the defendant discharged, and it is so ordered.

All concur.